IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CCC Information Services, Inc., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 03 C ~~2965~~ 2695 |
| | ) |
| Mitchell International, Inc., | ) Wayne R. Andersen |
| | ) District Judge |
| Defendants. | ) |

### MEMORANDUM, OPINION AND ORDER

For the following reasons we deny the defendant's motion for summary judgment.

### BACKGROUND

This case involves claim construction for a patent covering software used to estimate the cost of car repairs. To effectively understand the patent, we will begin with a discussion of the industry in which it is utilized. Plaintiff, CCC Information Services, Inc. ("CCC") and defendant Mitchell International Inc. ("Mitchell") are both in the business of providing software solutions to assist automotive insurance adjusters.

Typically, an insurance adjuster is presented with a damaged vehicle upon which an insured customer has made a claim. The insurance adjuster must then determine the most cost-effective way to settle that claim. The threshold question the adjuster faces is whether to fix the car or simply send it to a salvage yard and pay the insured the value of the car. To determine the cost of fixing the car (and the most cost-effective manner of fixing the car) the adjuster compares several variables. The adjuster must consider the cost of each car part that needs replacement. This entails comparing the cost of original equipment manufacturer (OEM) parts, recycled parts (taken from salvaged vehicles

or parts), and after market parts (made by manufacturers other than the company that originally manufactured the vehicle). In addition to the part costs, the insurance adjuster must compute the labor required to install the various parts.

An adjuster needs to make a large number of calculations to ascertain the cost of repairing even minor damage. For example, to compute the cost of repairing a simple broken door, an adjuster must calculate the price of OEM parts, recycled parts, and after market parts for the door, door hinge, window, rear view mirror, and potentially several other damaged parts. After that, the cost of labor for every part contemplated is calculated. The total costs for parts and labor is then compared to the salvage value of the vehicle to determine whether the car should be repaired or salvaged.

Computers offer significant efficiencies in this process. Without a computer, an adjuster would have to look up the cost of the various parts, comparing a myriad of variables of OEM parts, recycled parts, after market parts, and combinations thereof. With computers, adequate networks, and complete databases, an adjuster does not need to refer to the numerous catalogs and price sheets that list costs for OEM parts, recycled parts, and repair parts. Instead, the costs for various parts, which are stored in databases, can automatically populate computer screens, computers can calculate the total part and labor costs, and adjusters can complete their jobs much more efficiently.

CCC, Mitchell, and ADP Claims Services Group ("ADP"), which is not a party to this suit, are all competitors who sell auto insurance estimating software. On September 7, 1999, United States Patent No. 5,950,169, entitled "System and Method for Managing Insurance Claim Processing" ("169 Patent"), was issued. In the Complaint before this Court, CCC, which owns the 169 Patent, claims Mitchell is manufacturing and marketing software that infringes the 169 Patent. Mitchell claims that its software does not infringe the 169 Patent and that any interpretation of the

patent that renders Mitchell's product infringing would necessarily mean that the patent is void because it covers a product ADP had on the market prior to the submission of the 169 Patent to the United States Patent and Trademark Office ("PTO").

The 169 Patent is a detailed explanation of a software and computer networking solution for businesses involved in estimating car repair costs consisting of a two-page abstract, 29 sheets of diagrams, and twelve pages of double columns of text outlining the background of the invention, summary of the invention, description of the drawings, presently preferred embodiments of the invention, and claims of the patent. However, this lawsuit involves only one of 39 claims contained in the 169 Patent namely Claim 37, which covers:

> A system for processing an insurance claim for a vehicle, the system comprising:
> a first computer for generating an insurance claim assignment;
> a communication server capable of communicating with the first computer over a communication network;
> a second computer in communication with the communication server;
> a plurality of insurance claim datafiles generated at the second computer, each insurance claim datafile transferable over the communication network, and a plurality of insurance claim assignments, each of the plurality of insurance claim datafiles associated with a respective one of the insurance claim assignments; and
> a graphic user interface at the second computer, the graphic user interface comprising an estimate comparison screen for displaying information on a selected one of the plurality of insurance claim datafiles, the estimate comparison screen simultaneously displaying replacement cost data for original equipment manufacturer (OEM) parts, recycled parts, and after market parts, and displaying a part repair cost.

Figure 12 of the 169 Patent is shown below.



3

In the detailed description of the presently preferred embodiment, the 169 Patent says that Figure 12 demonstrates that "once the user has selected the replacement parts necessary from the [OEM] list database the user may select a comparison of all three possible replacement parts, whether OEM, recycled, or AM [after market] parts. . . .In this way, a user can see instantly the comparison of different methods and parts to determine the best course of action in settling a claim."

Mitchell sells a software product called Ultramate, which has a "Part Compare" feature that allows an estimator to compare the cost of repairing a part to the cost of replacing a part with a single OEM part, a single after market part, or a single recycled part. There is some dispute as to whether Mitchell's contentions are factually accurate. CCC's response to Mitchell's statement of material facts points out that the "Part Compare" feature in Ultramate 4.8 can display only one particular type of part (i.e., door hinge or mirror) yet will list multiple parts and prices if more than one manufacturer is available for that particular part. Accordingly, if there are four after market manufacturers of a door hinge, four part prices would supposedly be listed under the drop down menu for after market parts. The Ultramate "Part Compare" feature is reproduced below. There is some dispute as to what the various rows in the Ultramate "Part Compare" mean. However, "NW" appears to refer to a new, or OEM part, "LK" is a like new, or recycled part, "AM" is an aftermarket part, and "RM" is a remanufactured part according to Mitchell and a recycled part according to CCC.

| Part Compare for: Body Side Outer Panel - 113" WB R | | | | | | | |
|---|---|---|---|---|---|---|---|
| Part Type | Supplier | Price | Labor | Refinish | Adj. | Total | %OEM Select |
| NW | | 709.00 | 13.0 | 3.9 | 0.00 | 1,531.07 | 100% |
| RP | Existing | N/A | 0.0 | 2.4 | | 0 | 0% |
| AM | NONE/USE MY OWN | 0.00 | 13.0 | 3.9 | 0.00 | 0 | 0% |
| RM | NONE/USE MY OWN | 0.00 | 13.0 | 3.9 | 0.00 | 0 | 0% |
| LK | NONE/USE MY OWN | 0.00 | 15.5 | 1.0 | 30.00 | 0 | 0% |

Add'l Labor: 0.0     Add'l Op

OK     Cancel

4

Mitchell claims that ADP's estimating software, PenPro 1.1, was on sale in the United States in 1994 and was able to display the cost of one OEM part, one recycled part, and one aftermarket part, just as its Ultramate product does. The facts surrounding the sale of PenPro are contested. The parties do not agree on the dates PenPro 1.1 was sold. Whether certain exhibits refer to PenPro 1.1 or earlier versions of PenPro that were never sold to the public also remain contested. However, a copy of a screen from PenPro is produced below.

[screenshot of PenPro "Part Edit for FENDER, FRONT LT" screen]

The parties agree that PenPro uses the terms "PXN" to mean aftermarket and "Replace Salvage" to mean recycled. There is evidence in the record suggesting that in certain instances when the "PXN" price is displayed, the "OEM" price is removed.

CCC posits that the "Part Edit" feature in PenPro is a worksheet on which a user can manually enter data and that it was not able to automatically display cost data for recycled parts, aftermarket parts, and OEM Parts. Mitchell, on the other hand, argues that the "Part Edit" feature in PenPro was a "compare feature" similar to that covered in the 169 Patent. However, at least one early analysis of competing software by Mitchell employees listed PenPro as lacking a compare feature.

5

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment may only be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). When considering a summary judgment motion, we must view the evidence in the light most favorable to the non-moving party. *Hague v. Thompson Distribution Co.*, __F.3d__ 2006 WL 278142, 2 (7th Cir. 2006). However, "[a]n adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). "Speculation does not create a genuine issue of fact, instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995).

Summary judgment "is as appropriate in patent cases as in any other." *Barmag Barmer Maschinefabrik AG v. Maruta Machinery, Ltd.*, 731 F2d 831, 835 (Fed Cir. 1984). Summary judgment is especially appropriate where the parties' dispute is over claim construction, not the facts regarding the product accused of infringing the patent. This is because claim construction is a matter of law for the court to decide. *Markman v. Westview Instruments*, 52 F.3d 967, 976 (Fed. Cir. 1995). Likewise, a court can declare a patent invalid based on the fact the patent was anticipated by prior art and grant summary judgment. *See, e.g., Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001).

## DISCUSSION

This case centers around claim construction. Typically, an analysis of whether a patent is infringed is a two-step process: 1) construing the patent and its proper scope; and 2) determining whether the properly construed claims cover the allegedly infringing device. *Interactive Gift Exp.,*

6

*Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1330-1331 (Fed Cir. 2001). Here, however, the parties contest the claim construction yet essentially concede that an adverse finding on the claim construction destroys their respective cases. Mitchell argues the 169 Patent does not cover software that can display replacement cost data for only one OEM part, one recycled part, and one aftermarket part. CCC counters that the language "simultaneously displaying replacement cost data for original equipment manufacturer (OEM) parts, recycled parts, and after market parts, and displaying a part repair cost" is properly construed to cover both software that shows multiple OEM parts, recycled parts, and aftermarket parts at once and that which displays cost data for only one OEM part, one recycled part, and one aftermarket part. Mitchell's rejoinder to this argument is that, if it is true, the 169 Patent is invalid because PenPro is a prior art software product that would be covered by such a claim construction and was on sale at least a year prior to the filing of the 169 Patent. As such, we are confronted with two distinct questions: 1) What is the proper claim construction of the 169 Patent?; and 2) Does that claim construction render the 169 Patent invalid due to prior art?

I.  **Claim Construction**

There are two parts of the 169 Patent that figure significantly in our analysis, the claims and the specifications. The specification section of a patent "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. §122. The specification concludes "with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." *Id.*

"It is well-settled that, in interpreting an asserted claim, the court should look first to the

7

intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996) (citations omitted). However, there are several types of intrinsic evidence for us to consider such as the patent claims, the patent specifications, and the prosecution history. We do not consider all intrinsic evidence equally. *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331-1332 (Fed. Cir. 2001). We look first and foremost to the language of the claims themselves. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed.Cir.1999) ("The starting point for any claim construction must be the claims themselves."); *Interactive Gift Exp., Inc.*, 256 F.3d at 1331. In fact, a "'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.Cir. 2005) quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed.Cir. 2004)). While we give claim terms their "ordinary and customary reading," the inquiry focuses on "how a person of ordinary skill in the art understands a claim." *Id.*

If we must resolve any ambiguity in the claim language, we look to the remainder of the specification to provide context. *Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a part."); *Interactive Gift Exp., Inc.*, 256 F.3d at 1331. However, "[i]n examining the specification for proper context [] this court will not at any time import limitations from the specification into the claims." *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed.Cir.2005). Nevertheless, the Federal Circuit has recognized that "it is axiomatic that a claim construction that excludes a preferred embodiment is rarely, if ever, correct." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2002).

To ensure the proper claim construction analysis, we are cautioned against comparing "the

8

accused product with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee." *Johnson & Johnson Assoc., Inc. v. R.E. Service Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002). Likewise, we are not to simply compare the accused product to a figure in the patent. *See, eg., Environmental Instruments, Inc. v. Sutron Corp.*, 8777 F.2d 1561, 1564 (Fed. Cir. 1989). Instead, we must construe the claim terms and only then consider whether the accused product is infringing. *Interactive Gift Exp., Inc.*, 256 F.3d at 1331.

When analyzing claim terms, courts generally construe the plural to mean multiple. *See, e.g., Electro Scientific Indus. v. Dynamic Details, Inc.*, 307 F.3d 1343, 1349 (Fed. Cir. 2002). However, that is not always the case. In *Interactive Gift Express v. Compuserve Inc.*, the Federal Circuit construed a plural term to include the singular. 256 F.3d 1323 (Fed. Cir. 2001). *Interactive Gift* involved a patent involving the reproduction of "information in material objects at point of sale locations." *Id.* at 256 F.3d 1327. Essentially, the patent consisted of a machine that could place information on books, cassettes, and disks. The system involved two main machines: i) a central control station referred to as an "information control machine" or "ICM;" and ii) a "plurality of remotely located manufacturing stations referred to as 'information manufacturing machines' or 'IMMs.'" *Id.* at 1238. Claim 37 of the *Interactive Gift* patent covered "an information manufacturing machine located at a point of sale location for reproducing information in material objects. . . ." The district court held that a point of sale location "must have. . . at least two blank material objects" to infringe the patent." *Id.* at 1334. However, the Federal Circuit noted that "[a]lthough the single element of claim 37 initially mentions material objects in the plural, it is later modified by a singular reference and does not require more than one material object." *Id.* The Federal Circuit ultimately reversed the district court holding that "the entirety of the specification dictates that the reference to a plurality be understood to refer to a 'supply' of blank material objects, and that supply can consist of one material object." *Id.*

9

Claim 37's use of the language "simultaneously displaying replacement cost data for original equipment manufacturer (OEM) parts, recycled parts, and after market parts, and displaying a part repair cost" is best defined to include comparisons of a single OEM part, a single recycled part, and a single after market part. As in *Interactive Gift Express*, we feel that the claim language and the entirety of the specification dictate that "OEM parts, recycled parts, and after market parts" includes both the singular and the plural. Significantly, the singular "and displaying *a* part repair cost" is used in the same sentence as the plural "parts." This suggests that the plural and the singular are used interchangeably. If this Court were to read "OEM parts" to mean only multiple "OEM parts" and "a part repair cost" to mean only a single part repair cost, the part compare screen's efficacy vanishes. Comparing multiple parts, while only providing the cost for a single part, would not tell an adjuster which part is cheapest. Moreover, a comparison by definition contains more than one part. As such, use of the term "parts" is expected even if the comparison only involves two or three distinct types of parts.

While we will not import limitations from the specification into the claim, a careful reading of the specification supports a definition of Claim 37 including the comparison of an OEM part, a recycled part, and a an aftermarket part. Figure 12, which is referred to in the presently preferred embodiment, shows only one OEM part, one recycled part, and one after market part. The specification explains Figure 12 demonstrates that "once the user has selected the replacement parts necessary from the [OEM] list database the user may select a comparison of all three possible replacement parts, whether OEM, recycled, or AM [after market] parts. . . . In this way, a user can see instantly the comparison of different methods and parts to determine the best course of action in settling a claim. This language starkly indicates the plural "parts" is meant to refer to the multiple "parts" involved in any comparison of two or more "parts." The plural does not mean multiple types of parts, i.e., multiple OEM parts, multiple aftermarket parts, and multiple recycled parts are

10

compared.

To accept the defendant's definition would mean that Figure 12 is not covered by the 169 Patent. It is clear that the 169 Patent as a whole, and Claim 37 in particular, was focused on providing a user with a simple way to compare the costs of various repair options for damaged cars through the use of networked computers. This included both comparisons of multiple OEM parts, multiple aftermarket parts, and multiple recycled parts, and comparisons of a single OEM part, a single aftermarket part, and a single recycled part.

**II.    Prior Art**

A patent is invalid under 35 U.S.C. § 102 when "a prior art reference disclose[s] every limitation of the claimed invention, either explicitly or inherently." *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997). The "on sale" bar of 35 U.S.C. § 102(b) invalidates a patent if a product containing every limitation of a claim was "on sale in this country, more than one year prior to the date of the application for patent in the United States." A single sale, or offer for sale triggers the on sale bar. *See, e.g., In re Caveney*, 761 F.2d 671, 676 (Fed. Cir. 1985).

Defendant contends that PenPro 1.1 is prior art that invalidates the 169 Patent pursuant to the "on sale" bar contained in 35 U.S.C. § 102(b). If PenPro 1.1 included a part compare feature that simultaneously displayed a single OEM Part, a single aftermarket part, and a single recycled part and was on sale a more than a year prior to the submission of the 169 Patent, this may be true. However, whether PenPro 1.1 contained a "part compare" feature is hotly contested. Plaintiff points to an analysis done by the defendant prior to this litigation that concludes PenPro 1.1 lacked a "part compare" feature. As such, there is a genuinely disputed issue of material fact that precludes the entry of summary judgment on the grounds that PenPro 1.1 invalidates the 169 Patent under the "on sale" bar of 35 U.S.C. § 102(b).

## Conclusion

For the above stated reasons, defendant's motion for summary judgment [27-1] is denied.

It is so ordered.

                                                     _____
                                                           Wayne R. Andersen
                                                           United States District Court

Dated: 3/23/06